IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BARBARA JEAN LOVINS,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br><br>Case No. 2:11-cv-01023-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Barbara Jean Lovins filed this action asking the Court to reverse or remand the final agency decision denying her Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, *see* 42 U.S.C. §§ 401–434 (2010), and denying her Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, *see* 42 U.S.C. §§ 1381–1383f (2010).[1] The Administrative Law Judge ("ALJ") determined Ms. Lovins did not meet the eligibility standards for benefits because she did not have "a disability, as defined in the Social Security Act, from June 29, 2006 through the date of [the ALJ's] decision." (Admin. R. Doc. 25, certified copy tr. of R. of admin. proceedings: Barbara J. Lovins (hereinafter "Tr. __").) Having carefully considered the parties' memoranda and the complete record in this matter,[2] the Court REMANDS the Commissioner's decision for further findings because substantial evidence does not support the decision.

---

[1] On January 23, 2012, in accordance with 28 U.S.C. sections 636(c)(1) and (3) and Federal Rule of Civil Procedure 73, the parties consented to proceed before Magistrate Judge Brooke C. Wells. (*See* ECF No. 16.) On May 21, 2012, this case was reassigned to the undersigned Magistrate Judge. (*See* ECF No. 21.)

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

## FACTUAL AND PROCEDURAL HISTORY

In November 2006, Ms. Lovins filed for DIB and SSI alleging an onset date of disability of June 29, 2006. (Tr. 17.) The Regional Commissioner denied Ms. Lovins's claim on February 7, 2007, (Tr. 80–84), and again upon reconsideration on May 24, 2007. (Tr. 86–91.) Ms. Lovins requested a hearing before an ALJ; the hearing took place on August 7, 2008. (Tr. 31–46.) The ALJ issued a decision on September 3, 2008, ("Decision 1") finding Ms. Lovins did not qualify as disabled within the meaning of the Social Security Act. (Tr. 65–74.)

On November 3, 2008, Ms. Lovins requested the Appeals Council review Decision 1. (Tr. 111–16.) The Appeals Council granted Ms. Lovins's request for review, and on January 9, 2009, remanded Ms. Lovins's case to the ALJ for further proceedings. (Tr. 75–79.) A second hearing before the ALJ took place on November 18, 2009. (Tr. 47–60.) The ALJ issued a decision on February 8, 2010, ("Decision 2") addressing deficiencies the Appeals Council identified in Decision 1 and found Ms. Lovins did not qualify as disabled within the meaning of the Social Security Act.[3] (Tr. 14–30.) The Appeals Council denied Ms. Lovins's request for review on September 7, 2011, (Tr. 1–7), making Decision 2 the Commissioner's final decision for purposes of judicial review under 42 U.S.C. section 405(g).[4] *See* 20 C.F.R. § 404.981.

---

[3] The ALJ incorporated by reference Decision 1 in Decision 2. (Tr. 20.)

[4] Ms. Lovins submitted additional evidence dated after the ALJ issued Decision 2 to the Appeals Council. (*See* Tr. 498–525.) The Appeals Council did not have to consider the evidence because it is immaterial and does not relate to the period on or before the date of Decision 2. *See Chambers v. Barnhart*, 389 F.3d 1139, 1142–44 (10th Cir. 2004) (explaining the Appeals Council must consider evidence that is new, material, and related to the period on or before the date of the ALJ's decision). The evidence is immaterial because there is not a reasonable possibility it would have changed Decision 2. *Id.* at 1144 (citing *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994)).

I.     Medical History

Karen McBride, M.D., diagnosed Ms. Lovins with chronic obstructive pulmonary disease ("COPD") as early as April 7, 2005. (Tr. 223–25.) On May 16, 2007, a physician at Riverside County Regional Medical Center ("Riverside") examined Ms. Lovins and found her COPD stable and her dyslipidemia and hypertension controlled. (Tr. 267–68.) The physician also ordered a medical nebulizer and prescribed an inhaler to treat Ms. Lovins's COPD.[5] (*Id.*)

On October 25, 2005, Ms. Lovins went to the emergency room because she experienced shortness of breath. (Tr. 221–22.) Jeffery Brand, M.D., found Ms. Lovins's COPD exacerbated, and she had hypertension and COPD related asthma. (Tr. 219–20.) Dr. Brand treated Ms. Lovins with "aggressive bronchodilator therapy and intravenous steroids, as well as azithromycin" before discharging her on October 29. (*Id.*) At that time, Ms. Lovins could ambulate approximately 75 feet, experiencing short of breath at the end. (*Id.*) Dr. Brand prescribed several medications, instructed Ms. Lovins to stop smoking, and gave her a two-week "off work note" opining it would take her that long to recuperate. (*Id.*) Ms. Lovins followed up with her family doctor, Dr. McBride, on November 7. (Tr. 218.) Dr. McBride confirmed Ms. Lovins's condition had improved although she continued to suffer from COPD exacerbation, had uncontrolled hypertension, and had not quit smoking. (*Id.*)

On May 15, 2006, S. John, M.D., examined Ms. Lovins and prescribed medicine to treat Ms. Lovins's COPD and advised her to stop smoking. (Tr. 216–17.) An examination on September 22, 2006, found Ms. Lovins's COPD stable and her hypertension controlled with medication. (Tr. 280–81.)

---

[5] A letter from Dr. McBride, dated August 24, 2006, confirmed Ms. Lovins uses an oxygen concentrator and nebulizer to treat her COPD. (Tr. 227.)

On January 11, 2007, Ms. Lovins complained to R. Krishnan, M.D., that she had experienced "coughing all night" and "wheezing when lying down." (Tr. 243–44.) After examining Ms. Lovins, Dr. Krishnan proscribed new medications and continued others to treat an upper respiratory infection ("URI"), COPD, dyslipidemia, hypertension, and atypical chest pain likely related to the URI. (*Id.*) Dr. Krishnan also opined Ms. Lovins would be unable to perform "usual work" for sixteen weeks. (*Id.*)

On April 6, 2007, Ms. Lovins went to the emergency room for coughing and wheezing. (Tr. 238–42.) The medical staff treated her COPD exacerbation, which improved before discharge. An x-ray from the same day showed "mild bibasilar subsegmental atelectasis, unchanged since September 11, 2003 . . . . [and] moderate pulmonary hyperinflation . . . . suggesting possible chronic obstructive pulmonary disease." (Tr. 269.) Ms. Lovins went to the emergency room again on June 17, because she experienced chest pain. (Tr. 258–63.)

On June 18, 2007, Dr. Cynthia Tieu treated Ms. Lovins for COPD exacerbation and found Ms. Lovins's hypertension controlled, her COPD medically managed, and that she would be "disabled" for twelve weeks. (Tr. 253.) Dr. Tieu also provided Ms. Lovins a pamphlet with information on quitting smoking. (*Id.*) An x-ray from that same day showed no evidence of acute cardiopulmonary disease. (Tr. 250–52.) The record from the follow-up visit indicates Ms. Lovins "request[ed] to be put on permanent disability." (Tr. 255.)

During another follow-up visit at Riverside on July 16, 2007, the attending physician found Ms. Lovins's gastroesophageal reflux disease ("reflux") and hypertension under moderate control and her COPD stable. (Tr. 248–49.) The attending physician noted Ms. Lovins had quit

smoking five weeks prior and advised her to lose weight[6] in order to control her reflux and dyslipidemia. (*Id.*)

Regular examinations of Ms. Lovins by medical staff at Riverside between August 2007 and October 2009 showed no significant change in Ms. Lovins's condition, (*see* Tr. 315–99, 409–10, 419–31, 436–42, 483–97), though she did visit the emergency three times in 2009. The first emergency room visit in 2009 occurred March 17, when Ms. Lovins complained of shortness of breath that started a few days earlier and became progressively worse. (Tr. 411–18, 432–33.) An x-ray showed worsening in Ms. Lovins's lower lungs with infiltrates and pulmonary hyperinflation. (Tr. 434–35.) In addition to COPD, the attending physician diagnosed Ms. Lovins with community-aquired pneumonia. (Tr. 411.)

Ms. Lovins presented herself to the emergency room again on April 20, 2009, complaining of chest pain and shortness of breath. (Tr. 400–08.) The attending physician found Ms. Lovins also had a fever and that her symptoms likely related to the pneumonia. (*Id.*) By April 23, she felt better, and her asthma, COPD exacerbation, hypertension, and reflux had stabilized. (*Id.*) Ms. Lovins visited the emergency room for the third time on October 19, when she complained of tightness in her chest. (Tr. 473–82) The attending physician prescribed several medications and discharged Ms. Lovins hours after she arrived. (*Id.*)

## II.     Disability Assessments

Between January 2007 and July 2009 several physicians performed disability related examinations of Ms. Lovins and completed disability paperwork. On January 11, 2007, Dr. Tieu

---

[6] Ms. Lovins stands five feet eight inches tall and weighed 298 pounds on July 16, 2007. (Tr. 248.) Ms. Lovins's weight fluctuated, and by October 19, 2009 she weighed 275 pounds. (Tr. 473.)

filled out a State of California "Claim for Disability Insurance Benefits" stating Ms. Lovins had severe COPD, treated with inhalers and a medical nebulizer. (Tr. 228.)

On February 7, 2007, D.A. Haaland, M.D., filled out a "Physical Residual Functional Capacity Assessment" finding Ms. Lovins had COPD but could not find any symptoms of arthritis. (Tr. 229–35.) After reviewing medical records, Dr. Haaland concluded Ms. Lovins could perform a range of medium exertion work with postural and environmental limitations. (*Id*.) On May, 23, K.T. Vu, D.O., reviewed Dr. Haaland's assessment and concurred with his conclusion. (Tr. 245–46.)

On May 27, 2009, Joseph Nassir, M.D., examined Ms. Lovins, (Tr. 444–46), and completed a "Multiple Impairment Questionnaire." (Tr. 448–55.) Dr. Nassir concluded Ms. Lovins "is considered to be disabled" because she cannot "withstand substantial amount[s] of sitting or standing or walking" or "perform work activities on a sustained, regular basis." (Tr. 446.)

Lastly, on July 31, 2009, Shazia S. Khan, M.D., examined Ms. Lovins concluding she could perform a range of work with no postural limitations and no nonexertional limitations. (*See* Tr. 456–62 ("[Ms. Lovins] can lift or carry 50 pounds occasionally and 25 pounds frequently . . . . stand and walk for 6 hours in an 8-hour day . . . . [with] frequent breaks . . . . sit for 6 hours in an 8-hour day . . . . [and p]ush and pull, unlimited.").) Dr. Khan also filled out a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" reflecting Ms. Lovins's assessment. (Tr. 463–68.)

Ms. Lovins completed a Work History Report ("Report") on January 3, 2007. (*See* Tr. 175–83.) In the Report, Ms. Lovins attests that her prior work as a cashier required eight hours of crouching, kneeling, reaching, standing, stooping, typing, walking, and writing during an eight

6

hour shift; and eight hours of handling, grabbing, or grasping large and small objects during the same shift. (Tr. 179.) Ms. Lovins also attests that a shift at her prior work as a demonstrator required six hours of reaching, standing, and stooping; thirty minutes of walking; and six hours of handling, grabbing, or grasping large and small objects. (Tr. 176.) Additionally, Ms. Lovins included in the Report that her prior work as a telephone solicitor required seven hours and thirty minutes of sitting, typing, writing, and handling, grabbing, or grasping large and small objects during a seven hour and thirty minute shift. (Tr. 178, 180.)

### III. Second Administrative Hearing

At the second administrative hearing, Ms. Lovins was fifty-five years old and had worked as a demonstrator at Sam's Club from October 2003 until her termination on June 29, 2006. (Tr. 34, 43, 175–76.) Prior to working for Sam's Club, Ms. Lovins worked as a head veterinary technician from 1994 to 1995, worked at a warehouse in 1997, worked as a telephone surveyor from 1997 to 1998 and again from 2001 to 2002, as a retail cashier and customer service representative from October 1999 to July 2001, and as a ranch hand from March 2002 to October 2003. (Tr. 160–70, 175–82.)

After the administrative hearing the ALJ secured interrogatory responses from vocational expert Joseph M. Mooney. (*See* Tr. 138–39.) The ALJ sent the vocational expert's interrogatory responses to Ms. Lovins on December 10, 2009, and admitted the interrogatories into evidence after Ms. Lovins did not respond within ten days after she received the ALJ's letter. (Tr. 140–43.) Mr. Mooney ultimately concluded Ms. Lovins could "perform all of [her] past relevant work," and other jobs existed in the national and regional economy she could perform. (Tr. 138–39.)

7

## **STANDARD OF REVIEW**

42 U.S.C. section 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA"). The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards. 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The Commissioner's findings shall stand if supported by substantial evidence. 42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994). The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotations marks and citations omitted). Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted), but "review only the *sufficiency* of

the evidence," *Oldham v. Astrue,* 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court need not accept the Commissioner's findings mechanically, but must "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## **ANALYSIS**

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

The ALJ continued to evaluate Ms. Lovins's claim through step five, making the following findings of fact and conclusions of law with respect to Ms. Lovins:

1. "[Ms. Lovins] meets the insured status requirements of the Social Security Act through June 30, 2010." (Tr. 19.)
2. "[Ms. Lovins] has not engaged in substantial gainful activity since June 29, 2006, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*)." (*Id.*)
3. "[Ms. Lovins] has the following severe impairments: impairment of the respiratory system and obesity (20 C.F.R. 404.1520(c) and 416.920(c))." (*Id.*)
4. "[Ms. Lovins] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (Tr. 20.)

5. "After careful consideration of the entire record, I find that [Ms. Lovins] has the following residual functional capacity: the claimant can lift and/or carry 50 pounds occasionally and 25 pounds frequently; she can stand and/or walk for six hours out of an eight-hour workday with frequent breaks; she can sit for six hours out of an eight-hour workday; she can perform frequent reaching, feeling, and pushing/pulling bilaterally; she can perform occasional handling and fingering with the right hand and frequent handling and fingering with the left hand; she can operate foot controls continuously; she is precluded from crawling and can perform all other postural activities occasionally; she can frequently tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, and humidity and wetness; she can occasionally tolerate exposure to dusts, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations; and she can tolerate moderate noise." (*Id.*)
6. "[Ms. Lovins] is capable of performing past relevant work as a customer service – cashier, as a demonstrator, and as a telephone solicitor (survey). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965). (Tr. 23.)
7. "[Ms. Lovins] has not been under a disability, as defined in the Social Security Act from June 26, 2006 through the date of this decision (20 C.F.R. 404.1520(f) and 416.920(f))." (Tr. 25.)

In short, the ALJ concluded Ms. Lovins did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, that she had the residual functional capacity to perform a limited range of light to medium semi-skilled work, and that she did not qualify as disabled as defined in the Act from June, 29, 2006, the alleged onset date, through the date of the ALJ's decision. (Tr. 23–25.)

In support of her claim that this Court should reverse the Commissioner's decision, Ms. Lovins argues the ALJ erred: (1) by improperly rejecting the opinion of an examining physician; and (2) by failing to evaluate Ms. Lovins's credibility properly. The Court addresses each argument in turn.

### IV. Evaluation of Examining Physician Opinion Evidence

Ms. Lovins argues the ALJ erred when he rejected the opinion of the examining physician, Dr. Nassir because the ALJ did not provide a legally sufficient explanation for

rejecting Dr. Nassir's opinion. (Pl.'s Opening Br. 12–14, ECF No. 18.) The Court agrees.

An ALJ must evaluate every medical opinion, *see* 20 C.F.R. § 404.1527(c), and "evaluate a medical opinion from a non-treating physician using the same factors applicable to treating physician opinions." *Sitsler v. Astrue*, 410 Fed. App'x 112, 119 (10th Cir. 2011) (citing *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003)). 20 C.F.R. section 404.1527(c) provides the factors the ALJ must consider: "(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the" relevant evidence supports the physician's opinion; "(4) consistency between the opinion and the record as a whole; (5) whether" the physician specializes in the area upon which she or he renders an opinion; and "(6) other factors brought to the ALJ's attention [that] tend to support or contradict the opinion." *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (quoting *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)).

Moreover, the ALJ's decision need not *discuss explicitly* all of the factors for each of the medical opinions. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review). When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies. *See, e.g.*, *Eggleston v. Bowen,* 851 F.3d 1244, 1247 (10th Cir. 1988) (reflecting ALJ's resolution of evidentiary conflicts between medical providers).

To reject a medical opinion the ALJ must "provide specific, legitimate reasons," *Doyal,* 331 F.3d at 764 (citing *Drapeau*, 255 F.3d at 1213), and can disregard a non-treating physician's opinion completely "'only on the basis of contradictory medical evidence and *not due to his or*

*her own credibility judgments, speculation or lay opinion.*'" *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (emphasis in original) (citation omitted) (explaining application to a treating physician). Further, an ALJ "ha[s] an obligation under the applicable regulations to obtain additional information from [a physician] before rejecting [medical evidence] outright." *Id.*

Here, the ALJ specifically addressed Dr. Nassir's opinion in Decision 2 and rejected it because it "ha[d] no probative value." (*See* Tr. 22.) The ALJ found it had no probative value because Dr. Nassir's assessment of Ms. Lovins's conditions was "exaggerated in its limits, indulgent and accommodative." (*Id.*) Further, the ALJ asserts among other things the law firm representing Ms. Lovins frequently hires Dr. Nassir to "generate litigation supporting reports," that Dr. Nassir is "presumably paid for the report, and he understands his commission," and he has observed Dr. Nassir's opinion in other cases to "always assert whatever claimant [Dr. Nassir] is examining is disabled." (*Id.*) If true, this serious accusation provides ample grounds for the ALJ to reject Dr. Nassir's opinion. However, no evidence exists in the record to support these findings except for the ALJ's "testimony." Because the ALJ has concerns about Dr. Nassir's credibility he must request additional evidence to support his bold assertions of bias and wrongdoing on the part of Dr. Nassir and/or Ms. Lovins's counsel. For example, the ALJ could request a listing from Dr. Nassir of his engagements in social security cases for the last four years and what his general determinations were. Similarly, the ALJ could request a statement regarding how Ms. Lovins compensated the doctor. While the ALJ may reject Dr. Nassir's opinion based on the non-medical factors he cites, *see* SSR 06–03p (Aug. 9, 2006) (allowing ALJ to consider other factors that tend to support or contradict his opinion when determining how much weight to accord a medical opinion), to do so substantial evidence must support those

factors because this Court is "'not in a position to draw factual conclusions on behalf of the ALJ.'"  *Drapeau*, 255 F.3d at 1214 (quoting *Prince v. Sullivan*, 933 F.2d 598, 603 (7th Cir. 1991)).

The ALJ also found Dr. Nassir's opinion "inconsistent with the record as a whole and demonstrate[d] a lack of understanding of social security disability programs and evidentiary requirements." (Tr. 22.)  But the ALJ provided no explanation to support his conclusion.  Further, the ALJ may not ignore Dr. Nassir's opinion simply because Dr. Nassir concludes Ms. Lovins qualifies as disabled.[7]  Although the ALJ correctly states that a determination of disability is reserved to the Commissioner and Dr. Nassir's opinion is not entitled controlling weight, (*id.*), because the "ALJ does not provide any explanation for rejecting [Dr. Nassir's opinion], [the Court] cannot meaningfully review the ALJ's determination."  *Drapea*, 255 F.3d at 1214.

While the ALJ states that Dr. Nassir's RFC finding would allow Ms. Lovins to perform her past relevant work, the record is not clear.  (*Compare* Tr. 450–54, *with* Tr. 175–82.)  Ms. Lovins never explained how frequently she could change from sitting to standing or take breaks.  Thus, the Court cannot determine whether Ms. Lovins could have performed her prior work as performed under Dr. Nassir's RFC finding.  Because the Court cannot make that determination, the error exceeds the harmless error threshold, and the Court remands the case.

## V.     Evaluation of Ms. Lovins's Credibility

Next, Ms. Lovins argues no substantial evidence supports the ALJ's determination regarding her credibility, and the ALJ does not analyze her credibility properly.  (ECF No. 18 at

---

[7] *See* 20 C.F.R. § 416.927(d); SSR 96-5p (July 2, 1996) ("[A]judicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner . . . . [and] opinions from any medical source on issues reserved to the Commissioner must never be ignored.").

14–16.) The Court disagrees.

When evaluating credibility, the ALJ must follow the prescribed two-step process: (1) evaluate whether the claimant has an underlying medically determinable impairment one could reasonably expect to produce the claimant's pain or other symptoms; and (2) evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. *See Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000) (discussing factors to evaluate credibility). "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted). The ALJ must cite specific evidence used in evaluating a claimant's subjective complaints, and if he finds those complaints incredible, he must explain why. *See id.* But this analysis "does not require a formalistic factor-by-factor recitation of the evidence." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). "So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, [the credibility determination requisites] are satisfied." *Id.*

The ALJ followed the prescribed two-step process for evaluating self-reported symptoms. First, he evaluated whether Ms. Lovins had an underlying medically determinable impairment one could reasonably expect to produce pain or other symptoms; and second, he evaluated the intensity, persistence, and limiting effects of Ms. Lovins's symptoms to determine the extent to which they limited Ms. Lovins's functioning. (*See* Tr. 20–22.) As to the first step, the ALJ found Ms. Lovins's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (Tr. 21.)

At step two, the ALJ found Ms. Lovins's testimony regarding "the intensity, persistence and limiting effects of [Ms. Lovins's] symptoms are not credible to the extent those statements

are inconsistent with the residual functional capacity assessment [in the ALJ's decision]." (Tr. 21.) In addition to the reasons the ALJ provided in Decision 1, the ALJ cited specific evidence—or the lack thereof—to support his credibility determination in Decision 2. The ALJ discussed extensively Dr. Khan's assessment, (Tr. 22), which contradicts the severity of some of the symptoms Ms. Lovins described during the November 2009 hearing and her ability to control the pain associated with those symptoms.[8] (Tr. 50–59.) Further, the ALJ found the record did not support Ms. Lovins's assertion that her condition had worsened since the first hearing. He cited specific medical records that show the medical care she received had not changed and that although she had been hospitalized, the severity of her COPD had not changed since the August 2008 hearing. (Tr. 21.)

## **CONCLUSION**

Based on the foregoing, the Court REMANDS the Commissioner's decision for further findings because substantial evidence does not support the basis for his rejection of Dr. Nassir's opinion.

DATED this 23rd day of August, 2013.

BY THE COURT:

_____
Evelyn J. Furse
United States Magistrate Judge

---

[8] Specifically, Dr. Khan's assessment contradicts the severity of Ms. Lovins's subjective complaints about the effects of nerve damage in her neck and spine, the severity of her COPD, her limited motor skills, and her ability to ambulate effectively. (Tr. 456–70.)

16